UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALYECE CUMMINGS and DANIEL LAPKA, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> CHESAPEAKE ENERGY CORP., AMGS, L.L.C., CARMEN ACQUISITION, L.L.C., CHESAPEAKE ACQUISITION, L.L.C., CHESAPEAKE AEZ EXPLORATION, L.L.C., CHESAPEAKE APPALACHIA, L.L.C., CHESAPEAKE EAGLE CANADA CORP., CHESAPEAKE ENERGY LOUISIANA CORPORATION, CHESAPEAKE ENERGY MARKETING, INC., CHESAPEAKE ENO ACQUISITION, L.L.C., CHESAPEAKE EP, L.L.C., CHESAPEAKE E&P HOLDING CORPORATION, CHESAPEAKE EXPLORATION LIMITED PARTNERSHIP, CHESAPEAKE EXPLORATION, L.L.C., CHESAPEAKE LAND COMPANY, L.L.C., CHESAPEAKE LAND DEVELOPMENT COMPANY, L.L.C., CHESAPEAKE LOUISIANA, L.P., CHESAPEAKE MIDSTREAM DEVELOPMENT, L.L.C., CHESAPEAKE MIDSTREAM HOLDINGS, L.L.C., CHESAPEAKE MIDSTREAM MANAGEMENT, L.L.C., CHESAPEAKE NFW, L.P., CHESAPEAKE NG VENTURES CORPORATION, CHESAPEAKE OPERATING, INC., CHESAPEAKE ORC, L.L.C., CHESAPEAKE PERMIAN, L.P., CHESAPEAKE PLAZA, L.L.C., CHESAPEAKE PRH CORP., CHESAPEAKE ROYALTY, L.L.C., CHESAPEAKE SIGMA, L.P., CHESAPEAKE SOUTH TEXAS CORP., CHESAPEAKE VRT, L.L.C., CHESAPEAKE WEST TEXAS GATHERING, L.L.C., CHESAPEAKE ZAPATA, L.P., CHESAPEAKE-CLEMENTS ACQUISITION, L.L.C., CHESAPEAKE-STAGHORN ACQUISITION L.P., CHK ENERGY HOLDINGS, INC., CHK HOLDINGS CORPORATION, CHK HOLDINGS, L.L.C., COMPASS | No. 16-cv-2338 <br><br> **CLASS ACTION COMPLAINT** <br><br> <u>**JURY TRIAL DEMANDED**</u> |

MANUFACTURING, L.L.C., DIAMOND Y
ENTERPRISE, INCORPORATED, EMLP, L.L.C.,
EMPRESS, L.L.C., EMPRESS LOUISIANA
PROPERTIES, L.P., GENE D. YOST & SON, INC.,
GSF, L.L.C., GOTHIC PRODUCTION, L.L.C.,
GREAT PLAINS OILFIELD RENTAL, L.L.C.,
HAWG HAULING & DISPOSAL, LLC, HODGES
TRUCKING COMPANY, L.L.C., JOHN C. OXLEY,
L.L.C., LA LAND ACQUISITION
CORPORATION, MAYFIELD PROCESSING
L.L.C., MC LOUISIANA MINERALS, L.L.C., MC
MINERAL COMPANY, L.L.C., MIDCON
COMPRESSION, L.L.C., MIDCON
COMPRESSION, L.P., MKR HOLDINGS, L.L.C.,
NOMAC DRILLING CORPORATION, NOMAC
DRILLING, L.L.C., NORTHERN MICHIGAN
EXPLORATION COMPANY, L.L.C., OXLEY
PETROLEUM CO., VENTURA REFINING AND
TRANSMISSION, LLC, WINTER MOON
ENERGY COMPANY, L.L.C., WINTER MOON
ENERGY CORPORATION,

                    Defendants.

Plaintiffs Alyece Cummings and Daniel Lapka (collectively, "**Plaintiffs**"), individually and on behalf of all others similarly situated, by their undersigned counsel, allege the following upon personal knowledge as to their own acts, and upon information and belief based upon the investigation conducted by counsel as to all other matters.

## I.      INTRODUCTION AND NATURE OF THE ACTION

1.      This is a class action against Chesapeake Energy Corp. ("**Chesapeake**" or "**Defendant**") and each of the Guarantors (defined below) brought by each Plaintiff in his/her individual capacities and on behalf of all persons who beneficially held Chesapeake's (i) 6.875% senior notes due 2020 (CUSIP #165167BU0) (the "**6.875% Notes**") and (ii) 6.125% senior notes due 2021 (CUSIP #165167CG0) (the "**6.125% Notes**," and together with the 6.875% Notes, the

"**Class Notes**") from December 31, 2015 to the present.[1]  The 6.125% Notes were issued

pursuant to an August 2, 2010 Indenture (the "**Base Indenture**," Chesapeake Energy Corp.,

Form S-3 filed August 3, 2010, Ex. 4.1, a copy of which is attached as Exhibit A hereto) and a

February 11, 2011 Fifth Supplemental Indenture thereto (the "**Fifth Supplemental Indenture**"),

while the 6.875% Notes were issued pursuant to a November 8, 2005 Indenture (the "**2005**

**Indenture**," and with the Base Indenture and Fifth Supplemental Indenture, the "**Indentures**"),

each between Chesapeake, the Guarantors party thereto (collectively, the "**Guarantors**" or the

"**Guarantor Defendants**," and together with Chesapeake, the "**Defendants**") and The Bank of

New York Mellon Trust Company, N.A. ("**BNY Mellon**"), as trustee.  The 6.125% Notes were

upon issuance, and are today, registered securities under the Securities Act of 1933 (the

"**Securities Act**").  The 6.875% Notes were issued pursuant to exemptions under the Securities

Act, but were later registered under the Securities Act.  The Class Notes are senior unsecured

obligations of Chesapeake, which rank equally in right of payment with all of the Defendant's

existing and future senior unsecured indebtedness.

2.      Like many other mining and natural resources companies, Chesapeake has faced

severe challenges due to falling commodity prices, putting pressure on Chesapeake's ability to

repay its debt obligations.  When combined with a significant amount of indebtedness—

$11.6 billion as of September 30, 2015—the Defendant's "leverage and debt service obligations

may adversely affect its financial condition."  Chesapeake attempted to alleviate its debt crisis

when, on December 2, 2015, it announced a proposed private debt exchange (the "**Exchange**

**Offer**") whereby it would exchange and replace certain Class Notes as well as certain 6.625%

Notes, 5.375% Notes, 6.25% Notes, 6.5% Notes, 7.25% Notes, Floating Rate Notes, 4.875%

---

[1] As defined below, the Class excludes holders of Class Notes who are Qualified Institutional Buyers within the meaning of Rule 144A of the Securities Act ("**QIBs**").

3

Notes, and 5.75% Notes, as defined herein, for newly-issued 8.00% Second Lien Senior Secured Notes due 2022 (the "**8.00% 2L Notes**").  The Exchange Offer was consummated on December 31, 2015.  Specifically, $3.856 billion in aggregate principal amount of the aforementioned notes was exchanged in the Exchange Offer for $2.369 billion of 8.00% 2L Notes.  While approximately $1.5 billion aggregate principal amount of Class Notes was outstanding prior to the Exchange Offer, approximately $606.5 million aggregate principal amount of Class Notes was tendered in the Exchange Offer.  Thus, approximately $893.5 million in principal value of Class Notes was not tendered in the Exchange Offer.

3.      Even though the Class Notes were registered securities under the Securities Act, either at issuance or sold and later registered pursuant to a registration statement, Chesapeake made the Exchange Offer under exemptions to the Securities Act.  Chesapeake Energy Corp., Form 8-K filed December 31, 2015, Ex. 99.1 (a copy of which is attached as Exhibit B hereto). As such, the only holders of Class Notes who were eligible to participate in the Exchange Offer were QIBs within the meaning of Rule 144A of the Securities Act and non-U.S. persons within the meaning of Rule 902(k) of Regulation S of the Securities Act ("**non-U.S. persons**").  *Id*.  To be a QIB, an entity must, generally, own and invest, on a discretionary basis, at least $100 million in securities.  For a broker-dealer, the threshold for QIB status is $10 million, and banks and savings and loan associations must also have a net worth of at least $25 million to satisfy the QIB criteria.  17 C.F.R. § 230.144A.

4.      The Defendant's decision created two classes of holders of Class Notes with very unequal rights not based on any specific term of the Indentures. On one hand, the QIBs were entitled to exchange Class Notes for new, secured 8.00% 2L Notes.  On the other hand, the non-QIBs were denied the opportunity to participate in the Exchange Offer.

5.     Chesapeake stridently disclosed the risks to holders of Class Notes if they did not exchange their bonds for 8.00% 2L Notes in the Exchange Offer, while simultaneously denying Class members the opportunity to participate in the Exchange Offer. Chesapeake Energy Corp., Form 8-K filed December 2, 2015, Ex. 99.2 (a copy of which is attached as Exhibit C hereto).

6.     The direct effect of the Exchange Offer and the issuance of the 8.00% 2L Notes is that the obligations evidenced by the Class Notes are now subordinate to the obligations evidenced by the 8.00% 2L Notes.  While the Class Notes are senior unsecured obligations of Chesapeake, which rank equally in right of payment with all of Defendant's existing and future senior indebtedness, the Exchange Offer subordinates the Class Notes held by Class members to the QIBs who elected to exchange their Class Notes for 8.00% 2L Notes.  In doing so, Chesapeake impaired Class members' right to receive payment of the principal and interest under the Class Notes and the right to institute suit to compel such payment.  This disregard for the rights of Plaintiffs and other holders of Class Notes violated Section 316(b) of the Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa-77bbbb (the "**TIA**"), and the Indentures themselves. Indeed, the TIA was intended to protect such minority holders from conduct of issuers, as present here.

7.     The Defendant's decision to pursue this transaction benefiting only themselves and a minority of holders of Class Notes violated the implied covenant of good faith and fair dealing.  The decision of Chesapeake to engage in a private exchange offer for existing notes open only to QIBs, notwithstanding the fact that the Class Notes were sold pursuant to registration statements and purchased by non-QIBs, was unfair to holders of Class Notes who were excluded from the Exchange Offer.  The risk of such a private exchange offer was not disclosed by Chesapeake in their offering prospectuses for the Class Notes, nor could it have

been foreseen by Plaintiffs or the other Class members at the time they purchased their Class Notes.

8.      It is pervasive throughout the Indentures that holders of Class Notes shall not be treated differently. For example, the Indentures require, with respect to each series of Class Notes:

    a.   that, if less than all of a series of the Class Notes is to be redeemed, Class Notes of that series be selected for redemption *pro rata*, by lot or, if Class Notes of that series are listed on any securities exchange, by any other method that the Trustee considers *fair and appropriate* and that complies with the requirements of such exchange;

    b.   that any Net Proceeds Offer (as defined in Sections 4.01(c) of the Base Indenture and the 2005 Indenture) be made to *all* holder of Class Notes; and

    c.   that, if the amount available for repurchase pursuant to a Net Proceeds Offer is less than the principal amount of notes, including Class Notes, tendered in such offer, purchases shall be made on a *pro rata* basis.

9.      As a result of the Exchange Offer, Chesapeake unjustly enriched itself, reducing its indebtedness, while impairing the rights of Plaintiffs and other Class members to receive principal and interest and reducing the value of the Class Notes. Plaintiffs, on behalf of themselves and all others similarly situated, seek damages against Chesapeake and other appropriate relief.

## II.    JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action under Section 322(b) of the TIA, 15 U.S.C. § 77vvv(b).

11.     Furthermore, the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because this action is a class action in which the matter in controversy exceeds $5 million, and one or more members of the Class are citizens of a state different from the Defendants.

12.     Supplemental jurisdiction in this Court over Plaintiff's state law claims is proper under 28 U.S.C. § 1367.

13.     This Court has personal jurisdiction over the Defendants under N.Y. C.P.L.R. § 302(a) because the Defendants maintain sufficient minimum contacts in this jurisdiction, including the marketing and sale of the Class Notes and the marketing and exchange of the 8.00% 2L Notes.

14.     Venue in this District is proper under Section 322(b) of the TIA, 15 U.S.C. § 77 vvv(b), and Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and 28 U.S.C. § 1391(b) and (c).  The Defendants transact business within this District, and a substantial part of the events giving rise to the claims occurred in this District, including the marketing and sale of the Class Notes and the marketing and exchange of the 8.00% 2L Notes.  Moreover, each of the Indentures provides that it, and the Class Notes to which it pertains, shall be governed by the laws of the State of New York.

## III.    PARTIES

15.     Plaintiff Alyece Cummings acquired 6.875% Notes prior to the announcement of the Exchange Offer and has continued to hold 6.875% Notes at all times relevant to this action. Ms. Cummings is not a QIB within the meaning of Rule 144A of the Securities Act, and is a U.S. person within the meaning of Regulation S of the Securities Act, and was therefore ineligible to participate in the Exchange Offer.

16.     Plaintiff Daniel Lapka acquired 6.125% Notes prior to the announcement of the Exchange Offer and has continued to hold 6.125% Notes at all times relevant to this action.  Mr. Lapka is not a QIB within the meaning of Rule 144A of the Securities Act, and is a U.S. person within the meaning of Regulation S of the Securities Act, and was therefore ineligible to participate in the Exchange Offer.

17.     Defendant Chesapeake Energy Corp. is an Oklahoma corporation with its principal executive offices in Oklahoma City, Oklahoma.

18.     Defendant AMGS, L.L.C. is a guarantor under the Base Indenture.

19.     Defendant Carmen Acquisition, L.L.C. is a guarantor under the Base Indenture and 2005 Indenture.

20.     Defendant Chesapeake Acquisition, L.L.C. is a guarantor under the 2005 Indenture.

21.     Defendant Chesapeake Aez Exploration, L.L.C. is a guarantor under the Base Indenture.

22.     Defendant Chesapeake Appalachia, L.L.C. is a guarantor under the Base Indenture.

23.     Defendant Chesapeake Eagle Canada Corp. is a guarantor under the 2005 Indenture.

24.     Defendant Chesapeake Energy Louisiana Corporation is a guarantor under the Base Indenture and 2005 Indenture.

25.     Defendant Chesapeake Energy Marketing, INC. is a guarantor under the Base Indenture and 2005 Indenture.

26.     Defendant Chesapeake ENO Acquisition, L.L.C. is a guarantor under the 2005 Indenture.

27.     Defendant Chesapeake EP, L.L.C. is a guarantor under the 2005 Indenture.

28.     Defendant Chesapeake E&P Holding Corporation is a guarantor under the Base Indenture and the Fifth Supplemental Indenture.

29.     Defendant Chesapeake Exploration Limited Partnership is a guarantor under the 2005 Indenture.

30.     Defendant Chesapeake Exploration, L.L.C. is a guarantor under the Base Indenture.

31.     Defendant Chesapeake Land Company, L.L.C. is a guarantor under the 2005 Indenture.

32.     Defendant Chesapeake Land Development Company, L.L.C. is a guarantor under the Base Indenture.

33.     Defendant Chesapeake Louisiana, L.P. is a guarantor under the Base Indenture and 2005 Indenture.

34.     Defendant Chesapeake Midstream Development, L.L.C. is a guarantor under the Base Indenture.

35.     Defendant Chesapeake Midstream Holdings, L.L.C. is a guarantor under the Base Indenture.

36.     Defendant Chesapeake Midstream Management, L.L.C. is a guarantor under the Base Indenture.

37.     Defendant Chesapeake NFW, L.P. is a guarantor under the 2005 Indenture.

38.     Defendant Chesapeake NG Ventures Corporation is a guarantor under the Base Indenture.

39.     Defendant Chesapeake Operating, Inc. is a guarantor under the Base Indenture and 2005 Indenture.

40.     Defendant Chesapeake ORC, L.L.C. is a guarantor under the 2005 Indenture.

41.     Defendant Chesapeake Permian, L.P. is a guarantor under the 2005 Indenture.

42.     Defendant Chesapeake Plaza, L.L.C. is a guarantor under the Base Indenture.

43.     Defendant Chesapeake PRH Corp. is a guarantor under the 2005 Indenture.

44.     Defendant Chesapeake Royalty, L.L.C. is a guarantor under the Base Indenture and 2005 Indenture.

45.     Defendant Chesapeake Sigma, L.P. is a guarantor under the 2005 Indenture.

46.     Defendant Chesapeake South Texas Corp. is a guarantor under the 2005 Indenture.

47.     Defendant Chesapeake VRT, L.L.C. is a guarantor under the Base Indenture and the Fifth Supplemental Indenture.

48.     Defendant Chesapeake West Texas Gathering, L.L.C. is a guarantor under the Base Indenture.

49.     Defendant Chesapeake Zapata, L.P., is a guarantor under the 2005 Indenture.

50.     Defendant Chesapeake-Clements Acquisition, L.L.C. is a guarantor under the Base Indenture.

51.     Defendant Chesapeake-Staghorn Acquisition L.P. is a guarantor under the 2005 Indenture.

52.     Defendant CHK Energy Holdings, Inc. is a guarantor under the Base Indenture.

53.     Defendant CHK Holdings Corporation is a guarantor under the Base Indenture and the Fifth Supplemental Indenture.

54.     Defendant CHK Holdings, L.L.C. is a guarantor under the Base Indenture.

55.     Defendant Compass Manufacturing, L.L.C. is a guarantor under the Base Indenture.

56.     Defendant Diamond Y Enterprise, Incorporated is a guarantor under the Base Indenture.

57.     Defendant EMLP, L.L.C. is a guarantor under the Base Indenture and the Fifth Supplemental Indenture.

58.     Defendant Empress, L.L.C. is a guarantor under the Base Indenture and the Fifth Supplemental Indenture.

59.     Defendant Empress Louisiana Properties, L.P. is a guarantor under the Base Indenture.

60.     Defendant Gene D. Yost & Son, Inc. is a guarantor under the Base Indenture.

61.     Defendant GSF, L.L.C. is a guarantor under the Base Indenture.

62.     Defendant Great Plains Oilfield Rental, L.L.C. is a guarantor under the Base Indenture.

63.     Defendant Hawg Hauling & Disposal, LLC is a guarantor under the Base Indenture.

64.     Defendant Hodges Trucking Company, L.L.C. is a guarantor under the Base Indenture and the Fifth Supplemental Indenture.

65.     Defendant John C. Oxley, L.L.C. is a guarantor under the 2005 Indenture.

66.     Defendant LA Land Acquisition Corporation is a guarantor under the Base Indenture and the Fifth Supplemental Indenture.

67.     Defendant Mayfield Processing L.L.C. is a guarantor under the 2005 Indenture.

68.     Defendant MC Louisiana Minerals, L.L.C. is a guarantor under the Base Indenture.

69.    Defendant MC Mineral Company, L.L.C. is a guarantor under the Base Indenture and 2005 Indenture.

70.    Defendant Midcon Compression, L.L.C. is a guarantor under the Base Indenture.

71.    Defendant Midcon Compression, L.P., is a guarantor under the 2005 Indenture.

72.    Defendant MKR Holdings, L.L.C. is a guarantor under the Base Indenture.

73.    Defendant Nomac Drilling Corporation is a guarantor under the 2005 Indenture.

74.    Defendant Nomac Drilling, L.L.C. is a guarantor under the Base Indenture.

75.    Defendant Northern Michigan Exploration Company, L.L.C. is a guarantor under the Base Indenture and the Fifth Supplemental Indenture.

76.    Defendant Oxley Petroleum Co. is a guarantor under the 2005 Indenture.

77.    Defendant Ventura Refining and Transmission. LLC is a guarantor under the Base Indenture.

78.    Defendant Winter Moon Energy Company, L.L.C. is a guarantor under the Base Indenture and the Fifth Supplemental Indenture.

79.    Defendant Winter Moon Energy Corporation is a guarantor under the Base Indenture.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    CHESAPEAKE'S BACKGROUND AND DEBT.

80.    Chesapeake is a publicly traded corporation. It produces oil and natural gas—it is currently the second-largest producer of natural gas in the United States—and owns interests in approximately 43,700 oil and natural gas wells. *See* Chesapeake, Form 10-K for the year ended December 31, 2015, at 1 (a copy of which is attached as Exhibit D hereto).  Chesapeake's common shares are listed on the New York Stock Exchange under the symbol "CHK."

81.     Chesapeake, like many other mining and natural resources companies, has faced severe challenges from recent declines in commodity prices.  Chesapeake reduced its total capital expenditures by approximately 46% from 2014 to 2015 in response to the commodity price environment.  *Id.* at 2.  The company instituted a 15% workforce reduction "to reduce costs and better align our workforce with the needs of our business and current oil and natural gas commodity prices."  *Id.* at 43.  After eliminating quarterly cash dividends on its common stock effective the third quarter of 2015, Chesapeake suspended dividend payments on its convertible preferred stock in the first quarter of 2016.  *Id.* at 46.  In its most recent annual report, Chesapeake stated that despite these and other measures taken to mitigate liquidity concerns, "we may not be able to fund budgeted capital expenditures or meet or debt service requirements in 2017 and beyond."  *Id.*

82.     Moody's Investor Service ("**Moody's**") observed on August 14, 2015, that Chesapeake is carrying, gathering and transportation costs significantly higher than its natural gas focused peers, a relic of "volume commitments and contractual pricing mechanisms it agreed to several years to support construction of new midstream infrastructure necessary to meet its rapid production growth."  *See* Moody's, "Announcement: Moody's: Chesapeake Energy's credit metrics pressured by higher costs than peers," Aug. 14, 2015, available at https://www.moodys.com/research/Moodys-Chesapeake-Energys-credit-metrics-pressured-by-higher-costs-than--PR_332537, a copy of which is attached as Exhibit E hereto.  That production pace has slowed, however, and despite Chesapeake's focus on cutting its capital spending, these high gathering and transportation costs remain.  Moreover, this cost burden will be greater in 2016 due to lesser hedge protection.

83.     Chesapeake's financial troubles have affected its ability to repay the Class Notes. Moody's announced on October 5, 2015, that it had downgraded Chesapeake's corporate family rating to Ba2 from Ba1, and its senior unsecured notes ratings to Ba3 from Ba1.  *See* Moody's, "Rating Action: Moody's downgrades Chesapeake Energy's senior notes to Ba3; outlook negative," Oct. 5, 2015, available at https://www.moodys.com/research/Moodys-downgrades-Chesapeake-Energys-senior-notes-to-Ba3-negative-outlook--PR_336021, a copy of which is attached as Exhibit F hereto.

84.     Just two months later, Moody's again downgraded Chesapeake's corporate family rating, this time to B2 from Ba2.  *See* Moody's, "Rating Action: Moody's downgrades Chesapeake's senior notes to B3; assigns B1 rating to new second lien notes," Dec. 4, 2015, available at https://www.moodys.com/research/Moodys-downgrades-Chesapeakes-senior-notes-to-B3-assigns-B1-rating--PR_340395, a copy of which is attached as Exhibit G hereto.  Moody's also downgraded the company's senior unsecured notes to B3.  *Id.*  A Moody's Senior Vice President stated that "[t]he ratings downgrade reflects Chesapeake's persistently weak cash flow and the corresponding rising default risk.  Industry conditions are increasingly challenging for Chesapeake to complete asset sales of the scale necessary to reduce debt to sustainable levels." *Id.*

85.     The following month, Moody's changed Chesapeake's "Probability of Default" rating to B2-PD/LD from B2-PD.   *See* Moody's, "Rating Action: Moody's changes Chesapeake's Probability of Default Rating to B2-PD/LD," Jan. 7, 2016, available at https://www.moodys.com/research/Moodys-changes-Chesapeakes-Probability-of-Default-Rating-to-B2-PDLD--PR_342079, a copy of which is attached as Exhibit H hereto.  Moody's appended the "/LD" designation, indicating "limited default," in light of its view that the

Exchange Offer constituted a distressed exchange, which it categorizes as a default.  *Id*.  The "/LD" designation would be removed after three business days.  Moody's added, however, that "[t]he rating outlook remains negative."  *Id*.

86.     Indeed, later that same month, Moody's placed 69 energy companies, including Chesapeake, on review for downgrade.  *See* Moody's, "Rating Action: Moody's reviews energy companies in the US for downgrade," Jan. 21, 2016, available at https://www.moodys.com/research/Moodys-reviews-energy-companies-in-the-US-for-downgrade--PR_342569, a copy of which is attached as Exhibit I hereto.  Moody's stated that the review was justified in light of "nominal [oil] price lows not seen in more than a decade," as well as the "substantial risk that prices may recover much more slowly over the medium term than many company expect, as well as a risk that prices might fall further."  *Id*.

87.     As of December 31, 2015, Chesapeake had approximately $9.706 billion of funded debt.  Chesapeake Energy Corp. Form 10-K for the period ended December 31, 2015, p. 51.

88.     This included the Class Notes.  As of December 31, 2015, Chesapeake had approximately $304 million of principal amount of 6.875% Notes outstanding.  *Id*.

89.     As of December 31, 2015, Chesapeake had approximately $589 million of principal amount of 6.125% Notes outstanding.  *Id*.

90.     In addition to the Class Notes, as of December 31, 2015, Chesapeake had approximately $822 million of principal amount of senior notes due 2020 (CUSIP #165167CF2) (the "**6.625% Notes**") outstanding.  Chesapeake Energy Corp. Form 10-K for the period ended December 31, 2015, p. 51.

91.     As of December 31, 2015, Chesapeake had approximately $286 million of principal amount of 5.375% senior notes due 2021 (CUSIP #165167CK1) (the "**5.375% Notes**) outstanding. *Id.*

92.     As of December 31, 2015, Chesapeake had approximately $381 million of principal amount of 3.25% senior notes due 2016 (CUSIP #165167CJ4) (the "**3.25% Notes**") outstanding. *Id.*

93.     As of December 31, 2015, Chesapeake had approximately $329 million of principal amount of 6.25% Euro-denominated senior notes due 2017 (CUSIP #XS0273933902) (the "**6.25% Notes**") outstanding. *Id.*

94.     As of December 31, 2015, Chesapeake had approximately $453 million of principal amount of 6.5% senior notes due 2017 (CUSIP #165167BS5) (the "**6.5% Notes**") outstanding. *Id.*

95.     As of December 31, 2015, Chesapeake had approximately $538 million of principal amount of 7.25% senior notes due 2018 (CUSIP #165167CC9) (the "**7.25% Notes**") outstanding. *Id.*

96.     As of December 31, 2015, Chesapeake had approximately $1.104 billion of principal amount of Floating Rate senior notes due 2019 (CUSIP #165167CM7) (the "**Floating Rate Notes**") outstanding. *Id.*

97.     As of December 31, 2015, Chesapeake had approximately $639 million of principal amount of 4.875% senior notes due 2022 (CUSIP #165167CN5) (the "**4.875% Notes**") outstanding. *Id.*

98.     As of December 31, 2015, Chesapeake had approximately $384 million of principal amount of 5.75% senior notes due 2022 (CUSIP #165167CL9) (the "**5.75% Notes**") outstanding. *Id.*

99.     As of December 31, 2015, Chesapeake had approximately $2 million of principal amount of 2.75% contingent convertible senior notes due 2035 (CUSIP #165167BW6) (the "**2.75% Notes**") outstanding. *Id.*

100.    As of December 31, 2015, Chesapeake had approximately $1.11 billion of principal amount of 2.50% contingent convertible senior notes due 2037 (CUSIP #165167BZ9/165167CA3) (the "**2.50% Notes**") outstanding. *Id.*

101.    As of December 31, 2015, Chesapeake had approximately $340 million of principal amount of 2.25% contingent convertible senior notes due 2038 (CUSIP #165167CB1) (the "**2.25% Notes**") outstanding. *Id.*

102.    As of December 31, 2015, Chesapeake had approximately $2.425 billion of principal amount of 8.00% 2L Notes outstanding. *Id.*

103.    Chesapeake also has a $4 billion revolving credit facility. *Id.*  As of December 31, 2015, there was no outstanding borrowing under this facility. *Id.*, p. 50.

B.     CHESAPEAKE CONDUCTS THE EXCHANGE OFFER.

104.    On December 2, 2015, Chesapeake announced the commencement of the Exchange Offer, whereby certain eligible holders of the Class Notes and other Chesapeake debt securities would be given the opportunity to exchange those bonds for 8.00% 2L Notes. Chesapeake Energy Corp., Form 8-K filed December 2, 2015, Ex. 99.1 (a copy of which is attached as Exhibit J hereto).

105.    Because Chesapeake chose not to register the 8.00% 2L Notes under the Securities Act, the Exchange Offer, with respect to the Class Notes, was extended only to holders

of Class Notes who were QIBs within the meaning of Rule 144A or non-U.S. persons within the meaning of Rule 902(k) of Regulation S.  Plaintiffs and the Class were not given the opportunity to participate in the Exchange Offer, or even to receive the exchange memorandum made available to eligible holders of Class Notes informing them of how the Exchange Offer would negatively affect their interests in the Class Notes.

106.    While the exact terms of the Exchange Offer are presumably set forth in an offering memorandum, eligible holders participating in the Exchange Offer received between $527.50 and $608.75 in 8.00% 2L Notes for each $1,000 principal amount of Class Notes tendered (depending on when the holders tendered).  Chesapeake Energy Corp., Form 8-K filed December 2, 2015, Ex. 99.1.  While investors who accepted the Exchange Offer and exchanged their Class Notes for 8.00% 2L Notes agreed to reduced principal amounts and in some cases, a later maturity date, they collect a higher interest rate and enjoy a substantial advantage over the Class Notes by virtue of their second lien security interest in the Defendant's property.  This right provides holders of the 8.00% 2L Notes a superior position to holders of the Class Notes should the Class members seek remedies to enforce payment obligations under the Class Notes against the assets of the Chesapeake, and therefore is especially valuable in light of the Defendant's financial condition.

107.    Chesapeake disclosed the risks to holders of Class Notes if they did not exchange their bonds for 8.00% 2L Notes in the exchange offer.  Chesapeake Energy Corp., Form 8-K filed December 2, 2015, Ex. 99.2. For example:

> **The liquidity of the Class Notes that are not exchanged will be reduced.**
>
> Chesapeake Energy Corporation (the "**Company**" or "**we**") has outstanding (i) 6.250% euro-denominated senior notes due 2017, (ii) 6.50% senior notes due 2017, (iii) 7.25% senior notes due 2018, (iv) floating rate senior notes due 2019, (v) 6.625% senior notes due 2020, (vi) 6.875% senior notes due 2020, (vii) 6.125% senior notes due 2021, (viii) 5.375% senior notes due 2021, (ix) 4.875%

senior notes due 2022 and (x) 5.75% senior notes due 2023 (collectively, the "**Old Notes**"). The current trading market for the Old Notes is limited. Upon consummation of the separate offers (the "**Exchange Offers**") to holders of Old Notes (1) in the United States, who are "qualified institutional buyers" as defined in Rule 144A under the Securities Act of 1933, as amended (the "**Securities Act**") and (2) outside the United States, who are persons other than "U.S. persons" as defined in Rule 902 under the Securities Act in offshore transactions in compliance with Regulation S under the Securities Act to exchange the Old Notes for newly issued 8.00% Senior Secured Second Lien Notes due 2022 (the "**Second Lien Notes**"), the trading market for unexchanged Old Notes will become even more limited and could cease to exist due to the reduction in the amount of such Old Notes outstanding. A more limited trading market might adversely affect the liquidity, market price and price volatility of these securities. If a market for unexchanged Old Notes exists or develops, these securities may trade at a discount to the price at which the securities would trade if the amount outstanding were not reduced, depending on prevailing interest rates, the market for similar securities and other factors. However, there can be no assurance that an active market in the unexchanged Old Notes will exist, develop or be maintained or as to the prices at which the unexchanged Old Notes may be traded.

***If we consummate the Exchange Offers, existing ratings for our senior notes remaining outstanding following completion of the Exchange Offers may not be maintained.***

We cannot assure you that, as a result of the Exchange Offers, the rating agencies, including Standard & Poor's Ratings Services ("**S&P**"), Moody's Investor Services, Inc. ("**Moody's**") and Fitch Ratings, will not downgrade or negatively comment upon the ratings for our senior notes remaining outstanding following completion of the Exchange Offers. Any downgrade or negative comment would likely adversely affect the market price of the Old Notes and may adversely impact our ability to access the debt capital markets or obtain loans.

Chesapeake Energy Corp., Form 8-K filed December 2, 2015, Ex. 99.2 (emphasis in original).

108.    The 8.00% 2L Notes are senior secured second lien obligations of Chesapeake that are "jointly and severally, fully and unconditionally guaranteed by certain of our direct and indirect wholly owned subsidiaries."  Chesapeake Energy Corp., Form 10-K for the year ended December 31, 2015, p. 95.  Moreover,

The Second Lien Notes are secured second lien obligations and are effectively junior to our current and future secured first lien indebtedness, including indebtedness incurred under our revolving credit facility, to the extent of the value of the collateral securing such indebtedness, effectively senior to all of our existing and future unsecured indebtedness, including our outstanding senior

19

notes, to the extent of the value of the collateral, and senior to any future subordinated indebtedness that we may incur. . . . Chesapeake's obligations under the Second Lien Notes are jointly and severally, fully and unconditionally guaranteed by certain of our direct and indirect wholly owned subsidiaries.

*Id.*

109.    The Exchange Offer expired at 11:59 PM, New York City time, on December 30, 2015.  Chesapeake Energy Corp., Form 8-K filed December 31, 2015, Ex. 99.1.

110.    On December 31, 2015, Chesapeake announced the Exchange Offer's final results.  *Id.*

111.    On December 31, 2015, Chesapeake reported that approximately $196 million aggregate principal amount of 6.875% Notes, representing approximately 39.2% of the outstanding principal amount, had been validly tendered and not withdrawn.  *Id.*

112.    Following the consummation of the Exchange Offer, approximately $304 million aggregate principal amount of 6.875% Notes, representing approximately 60.8% of the outstanding principal amount had not been exchanged.  *Id.*

113.    On December 31, 2015, Chesapeake reported that approximately $411 million aggregate principal amount of 6.125% Notes, representing approximately 41.1% of the outstanding principal amount, had been validly tendered and not withdrawn.  *Id.*

114.    Following the consummation of the Exchange Offer, approximately $589million aggregate principal amount of 6.125% Notes, representing approximately 58.9% of the outstanding principal amount had not been exchanged.  *Id.*

115.    On December 31, 2015, Chesapeake reported that approximately $46 million aggregate principal amount of 6.25% Notes, representing approximately 12.2% of the outstanding principal amount, had been validly tendered and not withdrawn.  *Id.*

116.    Following the consummation of the Exchange Offer, approximately $332 million aggregate principal amount of 6.25% Notes, representing approximately 87.8% of the outstanding principal amount had not been exchanged.  *Id*.

117.    On December 31, 2015, Chesapeake reported that approximately $207 million aggregate principal amount of 6.5% Notes, representing approximately 31.4% of the outstanding principal amount, had been validly tendered and not withdrawn.  *Id*.

118.    Following the consummation of the Exchange Offer, approximately $453 million aggregate principal amount of 6.5% Notes, representing approximately 68.6% of the outstanding principal amount had not been exchanged.  *Id*.

119.    On December 31, 2015, Chesapeake reported that approximately $131 million aggregate principal amount of 7.25% Notes, representing approximately 19.6% of the outstanding principal amount, had been validly tendered and not withdrawn.  *Id*.

120.    Following the consummation of the Exchange Offer, approximately $538 million aggregate principal amount of 7.25% Notes, representing approximately 80.4% of the outstanding principal amount had not been exchanged.  *Id*.

121.    On December 31, 2015, Chesapeake reported that approximately $396 million aggregate principal amount of Floating Rate Notes, representing approximately 26.4% of the outstanding principal amount, had been validly tendered and not withdrawn.  *Id*.

122.    Following the consummation of the Exchange Offer, approximately $1,104 million aggregate principal amount of Floating Rate Notes, representing approximately 73.6% of the outstanding principal amount had not been exchanged.  *Id*.

123.   On December 31, 2015, Chesapeake reported that approximately $478 million aggregate principal amount of 6.625% Notes, representing approximately 36.8% of the outstanding principal amount, had been validly tendered and not withdrawn.  *Id.*

124.   Following the consummation of the Exchange Offer, approximately $822 million aggregate principal amount of 6.625% Notes, representing approximately 63.2% of the outstanding principal amount had not been exchanged.  *Id.*

125.   On December 31, 2015, Chesapeake reported that approximately $414 million aggregate principal amount of 5.375% Notes, representing approximately 59.1% of the outstanding principal amount, had been validly tendered and not withdrawn.  *Id.*

126.   Following the consummation of the Exchange Offer, approximately $286 million aggregate principal amount of 5.375% Notes, representing approximately 40.9% of the outstanding principal amount had not been exchanged.  *Id.*

127.   On December 31, 2015, Chesapeake reported that approximately $861 million aggregate principal amount of 4.875% Notes, representing approximately 57.4% of the outstanding principal amount, had been validly tendered and not withdrawn.  *Id.*

128.   Following the consummation of the Exchange Offer, approximately $639 million aggregate principal amount of 4.875% Notes, representing approximately 42.6% of the outstanding principal amount had not been exchanged.  *Id.*

129.   On December 31, 2015, Chesapeake reported that approximately $716 million aggregate principal amount of 5.75% Notes, representing approximately 65.1% of the outstanding principal amount, had been validly tendered and not withdrawn.  *Id.*

130.   Following the consummation of the Exchange Offer, approximately $384 million aggregate principal amount of 5.75% Notes, representing approximately 34.9% of the outstanding principal amount had not been exchanged.  *Id.*

131.   The settlement date for the Exchange Offer was December 31, 2015, on which date Chesapeake issued $2.369 billion in aggregate principal amount of 8.00% 2L Notes to the eligible holders who participated in the Exchange Offer.  Chesapeake Energy Corp. Form 8-K filed on December 31, 2015, Ex. 99.1.

132.   The 8.00% 2L Notes were issued pursuant to an indenture (the "**8.00% 2L Notes Indenture**") by and between Chesapeake, the guarantors party thereto, and Deutsche Bank Trust Company Americas ("**Deutsche Bank**"), as trustee and collateral trustee, dated as of December 23, 2015.  Chesapeake Energy Corp., Form 8-K filed December 23, 2015, Ex. 4.1

133.   The 8.00% 2L Notes were issued in accordance with exemptions from the registration requirements of the Securities Act afforded by Rule 144A and Regulation S under the Securities Act.  *Id.*

### C.   THE EXCHANGE OFFER DAMAGED PLAINTIFFS AND OTHER CLASS MEMBERS WHO WERE NOT ENTITLED TO PARTICIPATE.

134.   Because Plaintiffs and other Class members are not QIBs and are U.S. persons, Plaintiffs and other Class members were denied the opportunity to participate in the Exchange Offer, or even to receive an offering memorandum pertaining thereto.

135.   Not only did the Exchange Offer have the negative practical implications discussed above (amongst others), but it also breached Plaintiff's and the Class's rights under the Indentures.

### D.     THE REGISTRATION AND ISSUANCE OF THE CLASS NOTES.

136.    The 6.875% Notes were issued, in the aggregate principal amount of $500 million, pursuant to the 2005 Indenture under exemptions to registration provided by Rule 144A and Regulation S under the Securities Act.  Chesapeake Energy Corp., Form 8-K filed November 15, 2005, Ex. 4.1.1 (a copy of which is attached as Exhibit K hereto).

137.    In compliance with a registration rights agreement concerning the 6.875% Notes, Chesapeake filed a Prospectus Supplement with the SEC pursuant to Rule 424(b)(3) on May 4, 2006, offering to exchange up to $500 million aggregate principal amount of unregistered 6.875% Notes for 6.875% Notes that had been registered under the Securities Act.  This Prospectus Supplement supplemented the Registration Statement Chesapeake filed on Form S-4 on March 7, 2006.  On June 23, 2006, Chesapeake filed a Form 8-A (the "**2006 Registration Statement**," a copy of which is attached as Exhibit L hereto) for registration of 6.875% Notes that had been tendered pursuant to the applicable registration rights agreement.

138.    The 6.125% Notes were registered pursuant to the Registration Statement on Form S-3 filed with the U.S. Securities and Exchange Commission (the "**SEC**") on August 3, 2010 (the "**2010 Registration Statement**," a copy of which is attached as Exhibit M hereto). Chesapeake Form S-3 filed on August 3, 2010.  The 6.125% Notes were issued pursuant to a Prospectus Supplement filed with the SEC pursuant to Rule 424(b)(2) of the Securities Act on February 9, 2011 (a copy of which is attached as Exhibit N hereto), which supplemented the 2010 Registration Statement, as follows.

139.    The 6.125% Notes were issued pursuant to the Fifth Supplemental Indenture dated February 11, 2011, to the Base Indenture by and between Chesapeake, the guarantors party thereto, and BNY Mellon, as trustee.  Chesapeake Energy Corp., Form 8-A filed February 22, 2011, Ex. 4.2 (a copy of which is attached as Exhibit O hereto).

140.    At the time Chesapeake registered each series of the Class Notes, Chesapeake purported to meet all the reporting requirements listed under sections 12 or 15(d) of the Securities Exchange Act of 1934, which assumes that the company seeking registration already has some form of security registered with the SEC.

### E.    KEY PROVISIONS OF THE INDENTURES.

141.    Under both the 2005 Indenture and the Base Indenture, all holders have the right to receive payment of principal and interest.  Section 6.07 of the 2005 Indenture provides:

> Notwithstanding any other provision in this Indenture, ***the Holder of any Securities will have the right, which is absolute and unconditional, to receive payment of the principal of and interest*** on such Securities on the stated maturity therefor and ***to institute suit for the enforcement of any such payment***, ***and such right may not be impaired without the consent of such Holder***.

2005 Indenture, § 6.07 (emphasis added).

142.    Section 6.07 of the Base Indenture provides:

> Notwithstanding any other provision of this Indenture, ***the Holder of any Securities will have the right, which is absolute and unconditional, to receive payment of the principal of and interest*** on such Securities on the Maturity therefor and ***to institute suit for the enforcement of any such payment, and such right may not be impaired without the consent of such Holder***.

Base Indenture, § 6.07 (emphasis added).

143.    Section 6.07 of the 2005 Indenture and Section 6.07 of the Base Indenture are mandated by Section 316(b) of the TIA, 15 U.S.C. § 77ppp(b), which the 2005 Indenture and the Base Indenture both acknowledge.  *See* 2005 Indenture, at [ii]; Base Indenture, at [i].

144.    Both the 2005 Indenture and the Base Indenture restrict the remedies available to holders of notes issued under those indentures (the "**No-Action Clauses**").  Section 6.06 of the 2005 Indenture provides that:

> No Holder of any of the Securities will have any right to institute any proceeding, judicial or otherwise, or for the appointment of a receiver or trustee or pursue any remedy under this Indenture, unless:

(1) such Holder has previously given notice to the Trustee of a continuing Event of Default,

(2) the Holders of not less than 25% of the principal amount of the outstanding Securities have made written request to such Trustee to institute proceedings in respect of such Event of Default in its own name as Trustee under this Indenture,

(c) such Holder or Holders have offered to such Trustee indemnity reasonably satisfactory to it against the costs, expenses and liabilities to be incurred in compliance with such request,

(d) such Trustee for 60 days after its receipt of such notice, request and offer of indemnity has failed to institute any proceeding, and

(e) no direction inconsistent with such written request has been given to such Trustee during such 60-day period by the Holders of a majority of the principal amount of the outstanding Securities.

***A Holder may not use this Indenture to prejudice the rights of another Holder or to obtain a preference or priority over other Holders*** (it being understood that the Trustee does not have an affirmative duty to ascertain whether or not such actions or forbearances are unduly prejudicial to such Holders).

2005 Indenture, § 6.06 (emphasis added).

145.   Section 6.06 of the Base Indenture provides that

No Holder of any of the Securities of a series will have any right to institute any proceeding, judicial or otherwise, to appoint a receiver or trustee or to pursue any remedy under this Indenture, unless:

(1) such Holder has previously given notice to the Trustee of a continuing Event of Default with respect to such series,

(2) the Holders of not less than 25% of the principal amount of the outstanding Securities of such series have made written request to such Trustee to institute proceedings in respect of such Event of Default in its own name as Trustee under this Indenture,

(3) such Holder or Holders have offered to such Trustee indemnity reasonably satisfactory to it against the costs, expenses and liabilities to be incurred in compliance with such request,

(4) such Trustee for 60 days after its receipt of such notice, request and offer of indemnity has failed to institute any proceeding, and

(5) no direction inconsistent with such written request has been given to such Trustee during such 60-day period by the Holders of a majority of the principal amount of the outstanding Securities of such series.

*A Holder may not use this Indenture to prejudice the rights of another Holder or to obtain a preference or priority over other Holders.*

Base Indenture, § 6.06 (emphasis added).

146.     Section 3.02 of the 2005 Indenture requires that in the case of any redemption of less than all the 6.875% Notes, the 6.875% Notes to be redeemed must be selected "pro rata, by lot, or, if the Securities are listed on any securities exchange, by any other method that the Trustee considers fair and appropriate and that complies with the requirements of such exchange." 2005 Indenture, § 3.02.

147.     Section 3.03 of the Base Indenture requires that in the case of any redemption of less than all the 6.125% Notes, the 6.125% Notes to be redeemed must be selected "pro rata, by lot or, if the Securities of such series are listed on any securities exchange, by any other method that complies with the requirements of such exchange." Base Indenture, § 3.03.

148.     Moreover, both the 2005 Indenture and the Base Indenture require Chesapeake to use any "Excess Proceeds" of sale/leaseback transactions remaining after a specified period towards the repurchase of the Class Notes, among other debt securities. Any such "Net Proceeds Offer" must be made to all holders of the Class Notes. *See* 2005 Indenture, § 4.10(d); Base Indenture, § 4.10(d).

149.     If the amount available for repurchase is less than the principal amount of the indebtedness tendered in such Net Proceeds Offer, the 2005 Indenture and the Base Indenture both require Chesapeake to make purchases pursuant to such Net Proceeds Offer on a pro rata basis. *See* 2005 Indenture, § 4.10(c); Base Indenture, § 4.10(c).

150.     Section 10.02 of the Base Indenture provides:

27

Each Subsidiary Guarantor hereby, jointly and severally, fully and unconditionally guarantees, as principal obligor and not only as surety (such guarantee to be referred to herein as the "Guarantee"), to each Holder the due and punctual payment of the principal of, and any premium and interest on, the Securities and all other amounts due and payable under this Indenture and the Securities by the Company whether at Maturity or otherwise, including, without limitation, interest on the overdue principal of, and any premium and interest on, the Securities, to the extent lawful, all in accordance with the terms hereof and thereof; subject, however, to the limitations set forth in Section 10.06 and, in the case of the Guarantee of any Subordinated Debt Securities, to the subordination provisions contained in Article Eleven.

Base Indenture, § 10.02.

151.   Section 10.02 of the 2005 Indenture provides:

Each Subsidiary Guarantor hereby, jointly and severally, fully and unconditionally guarantees, as principal obligor and not only as surety (such guarantee to be referred to herein as the "Guarantee"), to each Holder and to the Trustee the due and punctual payment of the principal of, premium, if any, and interest on the Securities and all other amounts due and payable under this Indenture and the Securities by the Company whether at maturity, by acceleration, redemption, repurchase or otherwise, including, without limitation, interest on the overdue principal of, premium, if any, and interest on the Securities, to the extent lawful, all in accordance with the terms hereof and thereof; subject, however, to the limitations set forth in Section 10.05.

2005 Indenture, § 10.02.

152.   BNY Mellon is the trustee under the 2005 Indenture, the Base Indenture, and the Fifth Supplemental Indenture.  2005 Indenture, § 1.01 (definition of "Trustee") and p. 1; Base Indenture, § 1.01 (definition of "Trustee") and p. 1; Fifth Supplemental Indenture, p. 1.

153.   Section 11.08 of the 2005 Indenture states:

THIS INDENTURE AND THE SECURITIES AND THE GUARANTEES SHALL BE GOVERNED BY AND CONSTRUED IN ACCCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAWS TO THE EXTENTH THAT THE APPPLICATION OF THE LAW OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY, EXCEPT TO THE EXTENT THAT THE LAWS OF THE STATE OF NEW YORK WOULD REQUIRE THE APPLICATION OF THE LAWS FO ANOTHER

28

JURISDICTION    REGARDING    THE    VALIDITY    OF    THE
SECURITIES.

2005 Indenture, § 11.08 (emphasis in original).

154.    The Base Indenture and the Fifth Supplemental Indenture contain substantially

similar provisions.  Base Indenture, § 13.08; Fifth Supplemental Indenture, § 2.2.

### F.    THE NO-ACTION CLAUSES DO NOT BAR THIS ACTION.

155.    The No-Action Clauses of the 2005 Indenture and the Base Indenture do not bar

this action.  Sub-sections (4) and (5) of the No-Action Clauses provide for a 60-day waiting

period during which the trustee must wait for guidance from a majority of the noteholders after

receiving a written request to initiate an action from 25% or more of the noteholders.  Here,

Chesapeake announced the Exchange Offer on December 2, 2015, the Exchange Offer expired

on December 30, 2015, and settlement of the Exchange Offer occurred on December 31, 2015,

on which day the 8.00% 2L Notes and attendant security interest were issued and granted.  Thus,

noteholders were incapable of challenging the Exchange Offer through the trustees, since the

Exchange Offer was scheduled to close after only approximately a month, well before the 60-day

waiting period could run.

156.    Because it was impossible for Plaintiffs or any holders of the Class Notes to

comply with the No-Action Clauses before the Exchange Offer expired, the No-Action Clause

does not apply here.

## V.    CLASS ACTION ALLEGATIONS

157.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil

Procedure on behalf of the Class, defined as:

> all persons who beneficially held Class Notes during the period December 31, 2015
> to the present, who are not QIBs within the meaning of Rule 144A of the
> Securities Act, and who are U.S. persons within the meaning of Rule 902(k) of
> Regulation S of the Securities Act.

158.    Upon information and belief, the members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  While approximately $1.5 billion in aggregate principal amount of Class Notes was outstanding prior to the Exchange Offer, approximately $606.5 million aggregate principal amount of Class Notes was tendered in the Exchange Offer.  Thus, approximately $893.5 million in principal value of Class Notes was not tendered in the Exchange Offer.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are hundreds of members in the proposed Class.

159.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a.      whether Defendant's actions violated the TIA;

b.      whether Defendant's actions breached the Indentures;

c.      whether Defendant's actions breached the implied covenant of good faith and fair dealing with respect to the Indentures; and

d.      the extent of damages sustained by Class members, and the appropriate measure of damages or declaratory relief.

160.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendant's wrongful conduct.

161.    Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities, restructuring, and indenture litigation. Plaintiffs have no interests which conflict with those of the Class.

162.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

VI.     CAUSES OF ACTION

**COUNT ONE**
**The Trust Indenture Act – 15 U.S.C. §§ 77aaa, *et seq.***
**Against Chesapeake**

163.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

164.     The Class Notes are debt securities qualified under the TIA, which regulates debt securities.

165.     Section 316(b) of the TIA, 15 U.S.C. § 777ppp(b), requires that Plaintiff's and other noteholders' right to receive payment of principal and interest on a debt security on or after their respective due dates expressed in the Indentures shall not be impaired or affected without the consent of each holder.   Section 316(b) further provides that Plaintiff's and other noteholders' right to institute suit to compel such payment, may not be impaired by the Indentures, without the consent of each holder.

166.     The Exchange Offer impaired the rights of Plaintiffs and other Class members under the Indentures to receive interest and principal and to institute suit to compel such payment because their Class Notes are now subordinated to 8.00% 2L Notes with respect to assets of Chesapeake to which the 8.00% 2L Notes have liens.

167.     Chesapeake did not have the consent of Plaintiffs or the Class to consummate and finalize the Exchange Offer, or to otherwise impair Plaintiff's and the Class's rights under the Indentures governing the Class Notes.

168.    Chesapeake thereby violated the TIA.   Plaintiffs and the Class have suffered damages as a result of Defendant's violations of the TIA and will continue to be damaged in the future.

169.    Accordingly, Plaintiffs and the Class are entitled to the declaratory relief sought in Count Five.

## COUNT TWO
**Breach of Contract, 2005 Indenture, Section 6.07 and Base Indenture, Section 6.07 Against Chesapeake**

170.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

171.    The 2005 Indenture and the Base Indenture were at all relevant times valid and enforceable contracts.

172.    Section 6.07 of the 2005 Indenture promised Plaintiffs and members of the Class who held 6.875% Notes the unconditional right to receive principal and interest payments from Chesapeake and to institute suit to compel such payment without the consent of each holder. 2005 Indenture, § 6.07.

173.    Section 6.07 of the Base Indenture made that same promise to Plaintiffs and members of the Class who held 6.125% Notes.  Base Indenture, § 6.07.

174.    The Exchange Offer impaired the rights of Plaintiffs and other Class members under the Indentures to receive interest and principal and to institute suit to compel such payment because their Class Notes are now subordinated to 8.00% 2L Notes with respect to assets of Chesapeake to which the 8.00% 2L Notes have liens.

175.    Chesapeake did not have the consent of Plaintiffs or the Class to consummate and finalize the Exchange Offer, or to otherwise impair Plaintiff's and the Class's rights under the Indentures governing the Class Notes.

176.    Accordingly, Plaintiffs and the Class are entitled to the declaratory relief sought in Count Five.

177.    In addition, as a result of Chesapeake's breach of the Base Indenture and the 2005 Indenture, Plaintiffs and the Class have suffered damages in an amount to be determined at trial.

## COUNT THREE
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### Against Chesapeake

178.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

179.    The Indentures were at all relevant times valid and enforceable contracts.

180.    Like all contracts under New York law, the Indentures incorporate an implied covenant of good faith and fair dealing.

181.    Chesapeake's course of conduct violated the implied covenant of good faith and fair dealing and public policy because:

a.    Chesapeake disregarded the fact that the Class Notes were securities, registered pursuant to the Securities Act, that could be purchased by anyone, irrespective of whether such person was a QIB or a not a QIB;

b.    Through the Exchange Offer, Chesapeake voluntarily engaged in a private exchange offer, offered the QIBs only the opportunity to exchange their Class Notes for new 8.00% 2L Notes, and leaving the QIBs in the enviable position of being able to decide whether to participate in the Exchange Offer;

c.    As a consequence of Chesapeake's decision to make a private exchange offer of unregistered securities, Chesapeake deprived the non-QIBs of the ability to make the decision offered to the QIBs;

33

d.  Chesapeake did so, thus thwarting the non-QIBs ability to participate in the Exchange Offer, notwithstanding the fact that the Class Notes were previously registered and eligible to be purchased by non-QIBs; and

e.  Chesapeake also did so, notwithstanding the fact that the Indentures require:

i.  non-prejudicial actions by holders of Class Notes in enforcing their rights under the 2005 Indenture and the Base Indenture governing the relevant Class Notes (*see* 2005 Indenture, §6.06; Base Indenture, § 6.06);

ii.  if less than all of a series of Class Notes are redeemed, that Class Notes of that series be selected for redemption pro rata, by lot, or in a "fair and appropriate" manner (*see* 2005 Indenture, §3.02; Base Indenture, § 3.03); and

iii.  that any Net Proceeds Offer made by Chesapeake be mailed to each holder of Class Notes and that, if the amount available for repurchase pursuant to a Net Proceeds Offer is less than the principal amount of notes, including Class Notes, tendered in such offer, purchases shall be made on a *pro rata* basis (*see* 2005 Indenture, § 4.10(c), (d); Base Indenture, § 4.10(c), (d)).

182.   Among other things, the provisions of the 2005 Indenture and the Base Indenture demonstrate that, under the Indentures, the holders of Class Notes were to be treated equally irrespective of whether such holders were QIBs or non-QIBs.

183.     Chesapeake's actions deprived Plaintiffs of the benefit of their bargain under the Indentures.    Indeed, Chesapeake's actions will ultimately deprive Plaintiffs of the ultimate benefit of the Indentures—the right to receive payment of principal and interest.

184.     No reasonable person would have anticipated Chesapeake's course of conduct.  If it had been disclosed that Chesapeake might offer an advantageous exchange offer to only the QIBs, but not to the non-QIBs, no reasonable non-QIB would have entered into the contract.

185.     Chesapeake thereby breached the implied covenant of good faith and fair dealing. Plaintiffs and the Class have suffered damages as a result of Chesapeake's breach of the implied covenant and will continue to be damaged in the future.

**COUNT FOUR**
**Unjust Enrichment**
**Against Chesapeake**

186.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

187.     By entering into the Exchange Offer, Chesapeake unjustly enriched itself.  The Exchange Offer allowed Chesapeake to eliminate hundreds of millions of debt incurred under the Indentures.

188.     The Exchange Offer enriched Chesapeake at the expense of Plaintiffs and the Class.  As a direct and intentional result of the Exchange Offer, the Class Notes held by Plaintiffs and the Class have been subordinated to the 8.00% 2L Notes with respect to assets of Chesapeake to which the 8.00% 2L Notes have liens, reducing the value of the Class Notes and impairing the rights of Plaintiffs and other Class members under the Indentures to receive interest and principal.

189.   Equity and good conscience militate against permitting Chesapeake to retain the benefits of the Exchange Offer, since those benefits were obtained by intentionally violating Plaintiff's and the Class's contractual rights under the Indentures in a discriminatory manner.

**COUNT FIVE**
**Declaratory Judgment**
**Against Chesapeake**

190.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

191.   An actual controversy exists between Plaintiffs and Chesapeake regarding the validity and enforceability of the Exchange Offer and the 8.00% 2L Notes, and a declaration of rights under the Indentures is necessary and appropriate to establish that the Exchange Offer is ineffective and that the liens purportedly created in the Exchange Offer for the benefit of the 8.00% 2L Notes are null and void, ineffective and invalid.

192.   Under the TIA, Chesapeake was prohibited from impairing the rights of Plaintiffs and other Class members under the Indentures to receive interest and principal and to institute suit to compel such payment.

193.   The Exchange Offer impaired the rights of the Plaintiffs and other Class members under the Indentures to receive interest and principal and to institute suit to compel such payment because their Class Notes are now subordinated to 8.00% 2L Notes with respect to assets of Chesapeake to which the 8.00% 2L Notes have liens.  Chesapeake did not have the consent of Plaintiffs or the Class to consummate and finalize the Exchange Offer, or to otherwise impair Plaintiffs' and the Class's rights under the Indentures governing the Class Notes.

194.   Accordingly, Plaintiffs request a declaration, pursuant to 28 U.S.C. § 2201, that the Exchange Offer is null and void, ineffective and invalid, that any Liens created in the Exchange Offer for the benefit of the 8.00% 2L Notes are null and void, ineffective and invalid,

and that the Exchange Offer resulted in an Event of Default (as such term is defined in the Indentures).

### COUNT SIX
### Declaratory Judgment
### Against the Guarantor Defendants

195.     Plaintiffs incorporates by reference each preceding paragraph as though fully set forth herein.

196.     The terms of the 2005 Indenture, Base Indenture, and Fifth Supplemental Indenture and Guarantee were at all times herein valid and enforceable contract obligations of the Guarantors.

197.     An actual controversy exists between Plaintiffs and Guarantor Defendants regarding the validity and enforceability of the Exchange Offer and the Class Notes, and a declaration of rights under the Indentures is necessary and appropriate to establish any amounts due and owing by Chesapeake would also be due and owing by the Guarantor Defendants.

198.     Accordingly, Plaintiffs requests a declaration, pursuant to 28 U.S.C. § 2201, that any damages payable by Chesapeake hereunder shall also be payable by the Guarantor Defendants.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding Plaintiffs and the Class the declaratory relief requested herein;

C.     Awarding Plaintiffs and the Class damages, in an amount to be determined at trial;

D.     Awarding Plaintiffs reasonable costs and attorneys' fees; and

E.      Awarding such equitable, injunctive or other relief in Plaintiff's favor as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury.

Dated:  March 30, 2016

**GRANT & EISENHOFER P.A.**

Jay W. Eisenhofer
Gordon Z. Novod
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel:  646-722-8500
Fax:  646-722-8501
jeisenhofer@gelaw.com
gnovod@gelaw.com

**GARDY & NOTIS, LLP**

By: _/s/ Meagan Farmer_____
Mark C. Gardy
James S. Notis
Meagan Farmer
Tower 56
126 East 56th Street, 8th Floor
New York, New York 10022
Tel:  212-905-0509
Fax:  212-905-0508
mgardy@gardylaw.com
jnotis@gardylaw.com
mfarmer@gardylaw.com

*Attorneys for Plaintiffs*