# EXHIBIT B

13 CIV 1582

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
:
CHESAPEAKE ENERGY CORPORATION,          :
:
Plaintiff,          :
:
v.          :          Civil Action No. 13-Cv-____ (___)
:
THE BANK OF NEW YORK MELLON          :
TRUST COMPANY, N.A.,          :
:
:
Defendant.          :
-------------------------------------------------------x

JUDGE ENGELMAYER


# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
# ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION

RICHARD F. ZIEGLER (RZ0872)
STEPHEN L. ASCHER (SA7820)
MARC. B. HANKIN (MH7001)
ANNE CORTINA PERRY (AP8504)
JENNER & BLOCK LLP
919 Third Avenue, 37th Floor
New York, NY 10022-3908
*Counsel for Plaintiff*

# INTRODUCTION

Plaintiff Chesapeake Energy Corporation ("Chesapeake") has initiated this action against the indenture trustee for Chesapeake's $1.3 billion issue of senior notes, due 2019 ("2019 Notes") because Chesapeake and the trustee disagree on the date by which Chesapeake is entitled to give notice to exercise its contractual right to call the notes early. Under the applicable indenture and the prospectus provided to investors, Chesapeake has until March 15, 2013 to issue that notice, but the trustee, The Bank of New York Mellon Trust Company ("BNY Mellon"), has recently changed its position on this issue at the behest of a hedge fund that owns a tiny fraction of the notes, and now claims that any notice would be untimely because it was required to be issued by February 13, 2013.

Chesapeake's Complaint seeks declaratory relief that a notice issued by March 15 will be timely and effective. Since the notice can provide up to 60 days for payment of the redemption amount to take place (the $1.3 billion plus accrued interest), Chesapeake needs this declaration not later than May 10, 2013, a few days before the expiration of the 60-day period.

The primary focus of Chesapeake's Order to Show Cause – apart from seeking the scheduling of a prompt status conference so that the parties and the Court can determine how to achieve a declaratory ruling by early May on the March 15 vs. February 13 dispute – is a request for emergency relief by not later than next Thursday, March 14, concerning the effect Chesapeake's proposed March 15 notice will have in the event the Court does not determine that it is timely. BNY Mellon has refused to assure Chesapeake that it will treat Chesapeake's proposed March 15 notice in accordance with its terms, and apparently reserves the right to treat it in a manner that would impose irreparable harm on Chesapeake.

The irreparable harm – and the need for emergency relief to address it – arises because the indenture provides for two types of redemptions of the notes: first, there is a "Special Early Redemption" (called just that in both the prospectus and the indenture) that permits Chesapeake to redeem the 2019 Notes at "par" – their full face amount plus accrued interest. That special redemption can only be exercised if notice is issued during a four-month period that ends March 15, 2013. The second type of redemption can be noticed at any time after March 15 but it requires Chesapeake to pay the noteholders an additional "Make-Whole" amount that reflects the present value of the interest payments that would have been paid for the next six years until the 2019 maturity date of the notes.

A redemption under the "Make-Whole" provision would cost Chesapeake $400 million more than the Special Early Redemption at par, and Chesapeake has no business reason or purpose to issue a notice for a Make-Whole redemption, as is shown in the accompanying Declaration of Chesapeake's Chief Financial Officer. Unfortunately, BNY Mellon has refused to agree that it will treat Chesapeake's March 15 notice which is limited on its face to a Special Early Redemption, in accordance with its terms and apparently reserves the right, if Chesapeake issues that notice on March 15, to treat it in the future as having noticed a Make-Whole redemption if the Court has not declared March 15 a timely date for Chesapeake's notice of a Special Early Redemption at par.

Chesapeake cannot take the risk that if the March 15 notice is found untimely as to a Special Early Redemption, it will be deemed notice of a redemption under onerous economic terms that it did not intend to undertake. Consequently, to preserve the *status quo* and Chesapeake's ability to obtain a judicial determination of the March 15 vs. February 13 dispute

with BNY Mellon, Chesapeake seeks an immediate injunction permitting it to send the notice to noteholders by March 15, 2013, without any risk of the notice being misconstrued.

Without this emergency relief, Chesapeake will suffer irreparable harm. Chesapeake's lost opportunity to exercise the Special Early Redemption right would not be compensable because there is no practical way for Chesapeake to recover the lost value of that opportunity from the noteholders or from the defendant BNY Mellon. Because this lost opportunity is effectively "irreparable," it comfortably fits the definition of irreparable harm under federal law.

At the same time, the requested relief would not injure the noteholders at all. If the notice is ultimately found to have been timely, then the notes will be redeemed at par just as the contractual documents contemplate and the noteholders anticipated. If, on the other hand, the notice is found to have been untimely, then the noteholders will be entitled to continue receiving interest as if no notice had ever been sent. Because the requested relief would merely preserve the *status quo* and could not possibly injure the noteholders, Chesapeake also requests that the requested relief be granted without Chesapeake being required to post a bond.[1]

To allow an opportunity for the Special Early Redemption to be effectuated if the notice is determined to have been timely, Chesapeake also asks the Court to schedule expedited proceedings in this matter so that the Court can render a decision on the ultimate question of the

---

[1] "It is well-settled that a district court has 'wide discretion in the matter of security and it has been held proper for the court to require no bond where there has been no proof of likelihood of harm.'" *The New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 345 (S.D.N.Y. 2010) (quoting *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996)). *See, e.g., Asa v. Pictometry Int'l Corp.*, 757 F. Supp. 2d 238, 247 (W.D.N.Y. 2010) (declining to require a bond, and stating that "[s]ince the injunction does no more than preserve the preexisting status quo, in which the parties were engaged in an ongoing contractual relationship (which presumably was mutually beneficial to them), there is little risk of significant harm to either side"); *Rex Medical L.P. v. Angiotech Pharm. (US), Inc.*, 754 F. Supp. 2d 616, 627 (S.D.N.Y. 2010) ("[I]f the arbitrator rules as this Court believes he will rule, then the 'damage' to [the enjoined party] is nonexistent, because being forced to comply with contractual obligations that a party voluntarily entered into is simply not the sort of 'damage' that is compensable at law.").

notice's timeliness by May 10, 2013.  Assuming that Chesapeake gives notice on March 15, 2013, the "redemption date" can be no later than May 13, 2013, 60 days after notice.

Ewa For these reasons, which are explained more fully below, Chesapeake respectfully requests that the Court grant the preliminary relief set forth in the accompanying Order to Show Cause.

## STATEMENT OF FACTS

Plaintiff Chesapeake is a publicly traded independent oil and natural gas producer.  On February 16, 2012, Chesapeake completed a public offering of $1.3 billion of 6.775% Senior 2019 Notes Due 2019 (the "2019 Notes").  The offering was governed by a pre-existing indenture that covered other securities offerings as well (the "Base Indenture," attached to the Perry Decl. as Exhibit A), and a supplemental indenture entered into for the specific purpose of this offering (the "Supplemental Indenture," attached to the Perry Decl. as Exhibit B).  Defendant BNY Mellon is the trustee under the indentures.

### A.  Chesapeake's Special Early Redemption Option

Under the Supplemental Indenture, Chesapeake has the right to redeem the 2019 Notes at their par value, plus accrued interest to the date of redemption, so long as Chesapeake gives timely notice of redemption to holders of the 2019 Notes.  This provision was material to Chesapeake and to the purchasers of the bonds because it gave Chesapeake the right to retire and refinance the debt at a lower interest rate if prevailing interest rates declined during the intervening period – as they have to a dramatic extent.

The provision in the Supplemental Indenture governing a Special Early Redemption reads as follows:

(b)     At any time from and including November 15, 2012 to and including March 15, 2013 (the "Special Early Redemption Period"), the Company, at its option, may redeem the 2019 Notes in whole or from time to time in part for a

price equal to 100% of the principal amount of the 2019 Notes to be redeemed, plus accrued and unpaid interest on the 2019 Notes to be redeemed to the date of redemption; provided, however, that, immediately following any redemption of the 2019 Notes in part (and not in whole) pursuant to this Section 1.7(b), at least $250 million aggregate principal amount of the 2019 Notes remains outstanding. <u>The Company shall be permitted to exercise its option to redeem the 2019 Notes pursuant to this Section 1.7 so long as it gives the notice of redemption pursuant to Section 3.04 of the Base Indenture during the Special Early Redemption Period</u>. Any redemption pursuant to this Section 1.7(b) shall be conducted, to the extent applicable, pursuant to the provisions of Sections 3.02 through 3.07 of the Base Indenture.

Supplemental Indenture § 1.7(b) (emphasis added).

As the underlined language above indicates, Section 1.7(b) governs when the notice of redemption is to be given pursuant to Section 3.04 of the Base Indenture. Chesapeake submits that this language clearly and unambiguously provides that to be effective, notice of a Special Early Redemption must be given by March 15, 2013. Notably, Section 1.7(b) of the Supplemental Indenture does not refer to when the redemption date for a Special Early Redemption is to occur and does not even use the term "redemption date." Thus, Section 1.7(b) governs initiation of the redemption process through notice but does not address when the redemption should be completed.

## B. **Procedures for Exercising the Special Redemption Option**

The Base Indenture includes several general provisions that govern the process for effectuating redemptions, including (but not limited to) a Special Early Redemption under the Supplemental Indenture.

Section 3.04(a) of the Base Indenture provides that Chesapeake shall mail a notice of redemption "at least 30 days but not more than 60 days <u>before a redemption date</u>" to the holders of 2019 Notes at their respective registered address. Base Indenture § 3.04(a) (emphasis supplied). Accordingly, the redemption date that takes place pursuant to a notice cannot take place until at least thirty days after the notice has been mailed, and at Chesapeake's option, may

take place as late as sixty days after such mailing. The information to be set forth in such notice includes "(1) the redemption date, (2) the redemption price, [and] (3) the aggregate principal amount of Securities being redeemed . . ." *Id.* (emphasis added). Section 3.04(b) provides that, upon Chesapeake's request, the indenture trustee shall deliver this notice so long as Chesapeake makes the request at least 15 days before the notice is to be given. *Id.* § 3.04(b).

Section 3.05 of the Base Indenture governs the effect of a notice of redemption that is mailed to the noteholders. That section provides that "[o]nce notice of redemption is mailed in accordance with <u>Section 3.04</u>, Securities called for redemption become due and payable on the redemption date at the redemption price." *Id.* § 3.05 (emphasis in original). Accordingly, upon the mailing of the notice of redemption, the maturity date is accelerated to the redemption date, and Chesapeake is obligated to pay the noteholders the redemption price on that day.

Section 3.06 of the Base Indenture sets forth the actions that are to be taken on the redemption date. On that date, Chesapeake is obligated to deposit with the paying agent (which is BNY Mellon) no later than 11 a.m. New York City time funds sufficient to pay the aggregate redemption price for all of the 2019 Notes to be redeemed, plus accrued and unpaid interest to, but not including, the redemption date. *Id.* § 3.06.

## C. **Chesapeake Begins the Process of Exercising its Special Redemption Option**

On the morning of February 20, 2013, as part of Chesapeake's standard process to effectuate a redemption, representatives of Chesapeake spoke by telephone with a BNY Mellon vice president regarding the proposed redemption pursuant to Section 1.7(b) of the Supplemental Indenture. In that conversation, BNY Mellon indicated that it had consulted with counsel and that the notice of redemption pursuant to Section 1.7(b) of the Supplemental Indenture could be sent out on March 15. In addition, BNY Mellon stated that it would deliver the notice to noteholders in accordance with Section 3.04(b) of the Base Indenture, and that BNY Mellon would consent to shortening the 15-day notice period set forth in such section to two days. Accordingly, on February 20, 2013, Chesapeake believed, and the trustee agreed, that Chesapeake had until March 15, 2013 to exercise its option.

## D. **BNY Mellon Ceases Cooperating with the Special Early Redemption Process**

Later on February 20, 2013, BNY Mellon received a letter from a hedge fund known as River Birch Capital LLC ("River Birch"), a holder of $9 million of the 2019 Notes (*i.e.*, approximately 0.7% of the $1.3 billion issuance). In that letter, River Birch contended that the deadline for Chesapeake to issue a notice to redeem the 2019 Notes at par pursuant to Section 1.7(b) of the Supplemental Indenture had already passed. A copy of the River Birch letter to BNY Mellon is attached to the Perry Declaration as Exhibit E.

On February 22, 2013, representatives of Chesapeake spoke with BNY Mellon's counsel regarding the proposed Special Early Redemption, and the timing of the notice pursuant to Section 1.7(b) of the Supplemental Indenture. During this call, BNY Mellon and its counsel advised that BNY Mellon had changed its position, and stated that in its opinion Chesapeake no longer had the right to issue a notice of Special Early Redemption pursuant to Section 1.7(b).

BNY Mellon explained that, in light of its new position, BNY Mellon would not help implement the proposed redemption. BNY Mellon reiterated this position on February 28, 2013 in an additional call with its counsel and representatives of Chesapeake and its counsel.

## ARGUMENT

**A PRELIMINARY INJUNCTION IS NECESSARY AND APPROPRIATE TO PROTECT THE *STATUS QUO* AND PERMIT CHESAPEAKE TO SEND THE NOTICE OF SPECIAL EARLY REDEMPTION CONTEMPLATED BY THE SUPPLEMENTAL INDENTURE**

To obtain a preliminary injunction, a party must demonstrate, first, "that it will suffer irreparable harm absent injunctive relief and [second,] either (1) that it is likely to succeed on the merits of the action, or (2) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, provided that the balance of hardships tips decidedly in favor of the moving party." *Mullins v. City of New York*, 626 F.3d 47, 52-53 (2d Cir. 2010). "The purpose of a preliminary injunction is to preserve the status quo between parties pending a final determination of the merits." *Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*, 143 F.3d 688, 692 (2d Cir. 1998), *rev'd on other grounds,* 527 U.S. 308 (1999).

### A. Chesapeake Would Suffer Irreparable Harm If It Does Not Receive the Requested Injunctive Relief

Chesapeake will suffer irreparable harm if the preliminary injunction is not granted, because Chesapeake would be caught between a rock and a hard place: If Chesapeake gives the notice, it risks a finding that the notice was untimely and triggered a redemption at the Make-Whole Price rather than the Special Early Redemption at par that Chesapeake intended to trigger. In light of that risk, Chesapeake would be forced to forego giving the notice, in which case it would lose the right to redeem the 2019 Notes at par. Because the 2019 Notes carry a high rate of interest for 6 years until maturity, the loss of this right would require Chesapeake to continue

8

paying interest at the 6.775% rate over the remaining tenure of the bonds, even though prevailing interest rates have dropped dramatically in the intervening period, and Chesapeake bargained for the Special Early Redemption right specifically to permit refinancing at a lower rate.

Losing this right amounts to irreparable harm. Although the harm in question is "pecuniary," the loss of that opportunity is not reparable through the payment of money damages, because there is no way for Chesapeake to recoup that money if it does not give notice of the Special Early Redemption by March 15. If, for example, six months from now Chesapeake were to obtain a ruling that its interpretation of the indenture was correct, but Chesapeake had not sent a notice of Special Early Redemption, then it would be too late for Chesapeake to send the necessary notice and effectuate the Special Early Redemption.

Moreover, it would not be possible to recoup those funds through litigation. According to a recent Bloomberg public holder analysis, the 2019 Notes are held by over 100 institutions, and the 2019 Notes will trade in the market during the intervening period. (*See* Ex. G to Perry Decl.) Under these circumstances, it would not be feasible for Chesapeake to sue the noteholders to void its obligation to pay interest and require the noteholders to tender the 2019 Notes for redemption. Nor would it be practical to recover the funds in question from BNY Mellon, which is protected by broad indemnity provisions set forth in the Base Indenture. Base Indenture § 7.07.

Because these potential damages, though pecuniary, are not compensable, they amount to irreparable harm. *See United States v. New York*, 708 F.2d 92, 93 (2d Cir. 1983) (per curiam), *cert. denied,* 466 U.S. 936 (1984) (affirming the district court's holding that a party's injury "was irreparable even though [its] losses were only pecuniary because a suit in federal court against New York to recover the damages sustained by [it] would be barred by the Eleventh

Amendment"); *Blum v. Schlegel*, 830 F. Supp. 712, 725 (W.D.N.Y. 1993) ("[T]he Second

Circuit has determined that in cases where the defendant is protected by the Eleventh

Amendment which thus renders the plaintiff unable to recover monetary damages, the injury will

be irreparable."), *aff'd,* 18 F.3d 1005 (2d Cir. 1994). The Court of Appeals has also recognized

that, under certain circumstances, the loss of certain contractual rights causes irreparable harm

and can support a request for injunctive relief. *See, e.g., Oracle Real Estate Holdings I LLC v.

Adrian Holdings Co. I, LLC*, 582 F.Supp.2d 616, 625-27 (S.D.N.Y. 2008); *Alcatel Space, S.A. v.

Loral Space & Commc'ns Ltd.*, 154 F.Supp.2d 570, 584-85 (S.D.N.Y. 2001).

 While Chesapeake will suffer irreparable harm if it does not receive the requested relief,

the relief that Chesapeake is seeking in this preliminary injunction proceeding will not prejudice

the noteholders or the trustee at all. At this time, Chesapeake is seeking only an assurance that

if the Court determines that BNY Mellon and River Birch are correct and the notice of Special

Early Redemption is untimely, the proposed notice of Special Early Redemption under Section

1.7(b) will be a nullity, and will not be construed as a notice of redemption under Section 1.7(c)

requiring Chesapeake to pay the Make-Whole Price to the noteholders.

 If the Court rules within the next 60 days that the notice of Special Early Redemption was

timely, then Chesapeake will proceed with the Special Early Redemption on or about May 14,

2013, and the noteholders will be in precisely the position that they bargained for when they

purchased the 2019 Notes subject to the Special Early Redemption option. On the other hand, if

the Court rules that the notice of Special Early Redemption was untimely, then the noteholders

will retain their 2019 Notes as if no notice had been given, and they will be in the same position

that River Birch believes it is in today (*i.e.*, noteholders would hold 2019 Notes that are no

longer subject to the Special Early Redemption right). The only "prejudice" to noteholders

would be that they would not receive a windfall as a result of Chesapeake's notice being misconstrued; the noteholders have no right to such a windfall, and losing that possibility does not prejudice them.

Chesapeake is also justified in seeking this injunctive relief because its request is consistent with the provisions of the Supplemental Indenture. There is no reason why a notice that is untimely and ineffective to trigger a Special Early Redemption should instead trigger a redemption at the Make-Whole Price. The Special Early Redemption procedure is clearly distinct from a redemption that triggers the Make-Whole Price. These two different types of redemption can be triggered at different times (only during the 4-month Special Early Redemption Period ending March 15, 2013 vs. "after March 15, 2013") and have radically different financial consequences for Chesapeake and for the noteholders. There is no good reason for a notice that by its terms attempts to initiate a Special Early Redemption should instead be construed as initiating a redemption requiring payment of the Make-Whole Price. If a notice of a Special Early Redemption Period is determined to be untimely, then the most natural consequence of that determination should be that the notice was null and void, not that it triggers an unintended and unexpected $400 million make-whole payment.

The only basis for treating an untimely notice of a Special Early Redemption as an unintended notice of a redemption that includes a make-whole payment would be a formalistic reliance on the irrevocable nature of the notice pursuant to Section 3.05 of the Base Indenture. But the irrevocable nature of the notice does not mean that if the notice is untimely, it should give rise to a very different type of redemption. Thus, Chesapeake's request for this relief is amply supported by the language of the indentures.

In sum, although granting the relief sought by Chesapeake will not prejudice the noteholders at all, denying Chesapeake this relief would severely prejudice Chesapeake by exposing it to the risk that its notice of Special Early Redemption under Section 1.7(b) would be misconstrued as a notice of redemption under Section 1.7(c), in which case Chesapeake would be required to redeem the 2019 Notes and pay a make-whole payment to the noteholders of approximately $400 million. Chesapeake seeks a ruling merely to eliminate this risk.

## B. **Chesapeake Is Likely To Succeed on the Merits**

Chesapeake is likely to prevail on the merits of the ultimate dispute because the Supplemental Indenture provides clearly and unambiguously that Chesapeake has the option to give notice of a Special Early Redemption "to and including March 15, 2013."

"Interpretation of indenture provisions is a matter of basic contract law." *Sharon Steel Corp. v. Chase Manhattan Bank*, 691 F.2d 1039, 1049 (2d Cir. 1982), *cert. denied*, 460 U.S. 1012 (1983). "It is axiomatic that where the language of a contract is unambiguous, the parties' intent is determined within the four corners of the contract, without reference to external evidence." *Feifer v. Prudential Ins. Co. of Am.*, 306 F.3d 1202, 1210 (2d Cir. 2002). "Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000).

Under these principles, "[a]n ambiguity exists [only] where the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 466

12

(2d Cir. 2010) (internal quotations omitted). "[T]he court should not find the contract ambiguous where the interpretation urged by one party would strain the contract language beyond its reasonable and ordinary meaning." *Id.* at 467 (internal quotations omitted).

Here, there is no ambiguity. The Supplemental Indenture provides that "The Company shall be permitted to exercise its option to redeem the 2019 Notes pursuant to Section 1.7 so long as it gives the notice of redemption pursuant to Section 3.04 of the Base Indenture during the Special Early Redemption Period." The Special Early Redemption Period is defined as "from and including November 15, 2012 to and including March 15, 2013." Section 1.7(b) plainly and unambiguously provides that Chesapeake has until March 15 to provide notice of a Special Early Redemption.

Despite the above-quoted provision, BNY Mellon – only after receiving River Birch's letter – has contended that March 15 is the last date for Chesapeake to complete the final step for a Special Early Redemption, not that March 15 is the last date for Chesapeake to give notice of a Special Early Redemption. BNY Mellon apparently relies on the words "pursuant to Section 3.04 of the Base Indenture" within Section 1.7(b) of the Supplemental Indenture, as well as the next sentence of Section 1.7(b), which provides, "Any redemption pursuant to this Section 1.7(b) shall be conducted, to the extent applicable, pursuant to the provisions of Sections 3.02 through 3.07 of the Base Indenture." Because Section 3.04 of the Base Indenture provides that Chesapeake must give notice at least 30 and not more than 60 days "before a redemption date," BNY Mellon apparently believes that reading Section 3.04 of the Base Indenture in combination with Section 1.7(b) of the Supplemental Indenture requires Chesapeake to give notice of any Special Early Redemption by not later than February 13, not by March 15.

13

BNY Mellon's interpretation of these provisions would strain the contractual language in at least four ways, by (1) establishing a February 13 deadline that is nowhere mentioned in the Supplemental Indenture, (2) rendering the key notice provision of Section 1.7(b) superfluous, (3) importing a requirement of when the "redemption date" must occur into a provision that does not use the words "redemption date," and (4) shortening a clearly disclosed 4-month period to only 3 months.

First, BNY Mellon's construction of these two provisions would contradict the plain language of the sentence in Section 1.7(b) of the Supplemental Indenture that states that notice of a Special Early Redemption is timely "so long as [Chesapeake] gives the notice of redemption" "during the Special Early Redemption Period" ending on March 15, 2013. If BNY Mellon's construction of these two provisions were correct, then that sentence ought to read that Chesapeake could conduct a Special Early Redemption so long as it gives notice by February 13, 2013. There is no way to accept BNY Mellon's interpretation of the Supplemental Indenture without rewriting this crystal clear sentence to substitute February 13 for March 15.

Second, and relatedly, if BNY Mellon's interpretation of Section 1.7(b) were correct, the key sentence noted above – that Chesapeake can exercise its option "so long as it gives the notice of redemption pursuant to Section 3.04 of the Base Indenture during the Special Early Redemption Period" – would be entirely superfluous. BNY Mellon's interpretation of Section 1.7(b) relies on the first sentence of Section 1.7(b), which provides for a Special Early Redemption Period ending on March 15, 2013, and the last sentence of Section 1.7(b), which provides that any such redemption "shall be conducted, to the extent applicable, pursuant to the provisions of Section 3.02 through Section 3.07 of the Base Indenture." If the parties had intended Chesapeake's option to expire on February 13, 2013, as BNY Mellon apparently

14

believes, these two sentences taken together could be read for that proposition, and there would have been no need to include the additional sentence providing that Chesapeake shall have that option so long as it gives notice by March 15, 2013. The Court should not read the contract in a way that would render this provision superfluous. *See Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012) ("Any interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible.") (internal quotations omitted). To the contrary, the Court should recognize that the addition of that third sentence demonstrates the parties' intention for the option to expire on March 15, 2013.

Third, BNY Mellon's belatedly revised reading of this provision confuses the notice date with the "redemption date." Section 1.7(b) plainly sets forth the period when the redemption has to be noticed rather than the period when the redemption has to be completed. Nothing in Section 1.7(b) speaks to when the "redemption date" must occur. In fact, the term "redemption date," though used 18 times throughout the Base Indenture (Sections 2.11, 3.02, 3.03, 3.04, 3.05, 3.06, 8.05, and 12.01), does not appear in Section 1.7(b) of the Supplemental Indenture. That omission is no coincidence: Section 1.7(b) simply does not establish a redemption date – it establishes only a notice date.

Indeed, Section 3.05 of the Base Indenture makes clear the distinction between the notice date and the redemption date. Section 3.05 provides:

> Once notice of redemption is mailed in accordance with Section 3.04, Securities called for redemption become due and payable on the redemption date at the redemption price. Upon surrender to the Paying Agent, such Securities shall be paid at the redemption price, plus accrued and unpaid interest to, but not including, the redemption date; <u>provided</u>, <u>however</u>, that installments of interest that are due and payable on or prior to the redemption date shall be payable to the Holders of such Securities…

Base Indenture § 3.05 (emphasis in original). Thus, as soon as Chesapeake gives notice of its intention to redeem the bonds on a particular redemption date at a particular redemption price,

the bonds are due to be redeemed. The fact that notice is irrevocable upon mailing makes clear that a redemption begins as soon as notice is given, not when the last ministerial steps of the redemption are finally executed. The key concept is notice, not the ministerial acts of tendering 2019 Notes or money.

Yet another problem with BNY Mellon's construction of these two provisions is that it would shorten the 4-month period set forth in Section 1.7(b) to a 3-month period. More specifically, under BNY Mellon's construction, Chesapeake's time to provide notice would run from November 15, 2012 to only February 13, 2013, a period of less than 3 months. But the Supplemental Indenture clearly provides for a 4-month window.

While BNY Mellon's interpretation of the Supplemental Indenture would introduce numerous internal inconsistencies in the Special Early Redemption procedure, Chesapeake's interpretation of these provisions is consistent and workable. Because under Section 3.04 of the Base Indenture notice of a Special Early Redemption must occur between 30 and 60 days before the redemption date, the proper reading of the two indenture provisions together is that the notice date must be "during the Special Early Redemption Period" "to and including March 15, 2013," and the "redemption date" for any Special Early Redemption may be as late as 60 days after that date. Thus, under Chesapeake's interpretation:

- Chesapeake had between November 15, 2012 and March 15, 2013 to give notice of a Special Early Redemption – precisely the 120-day period set forth in Section 1.7(b) of the Supplemental Indenture (and disclosed in the offering documents, as noted below);

- The redemption would begin and become irrevocable as soon as notice is given within precisely the same period; and

- The redemption would be completed and the noteholders would then receive payment, between 30 and 60 days after notice.

For all these reasons, the provisions in question are clear and unambiguous.

If, however, the Court determines that the Supplemental Indenture is ambiguous, Chesapeake believes that it is still likely to prevail on the merits as a result of extrinsic evidence that it will produce concerning the intentions of the drafters. For example, on February 13, 2012, shortly before a conference call and webcast for prospective investors, Chesapeake released to institutional investors a preliminary prospectus. The preliminary prospectus expressly states in both the Offering Summary and the Description of 2019 Notes sections that "We may redeem the 2019 Notes pursuant to the special early redemption provisions so long as the notice of redemption is given during the Early Redemption Period." (*See* Ex. C to Perry Decl. at S-7 and S-30.) Thus, the preliminary prospectus unambiguously permits Chesapeake to effectuate the Special Early Redemption by providing notice of redemption on or before March 15, 2013, the last day of the Early Redemption Period.

In addition, Chesapeake is currently submitting a declaration from Michael S. Telle and Domenic J. Dell'Osso, Jr., and if necessary Chesapeake will submit additional declarations from individuals who were involved in the issuance of the 2019 Notes attesting to their intentions and understandings of the Supplemental Indenture at the time. Chesapeake believes that the extrinsic evidence would universally support its understanding of the notice provision; no party that actively participated in the offering or in drafting the Supplemental Indenture intended for the notice period to expire on February 13 rather than March 15, 2013.

In sum, Chesapeake believes that it is highly likely to prevail on the merits based on the four corners of the Base Indenture and the Supplemental Indenture, but even if the Court finds

the contractual documents ambiguous, Chesapeake will prevail based on unopposed extrinsic evidence concerning the intent of the drafters.

## C. The Balance of Hardships Tilts Decidedly in Chesapeake's Favor

Even if the Court is unable to decide at this time that Chesapeake is likely to succeed on the merits, the Court should still grant Chesapeake's application, because there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and the balance of hardships tips decidedly in favor of the moving party.

As noted above, the validity of a valuable contractual right concerning $1.3 billion in 2019 Notes is in dispute, and BNY Mellon is preventing Chesapeake from exercising that right. It can hardly be doubted that this question is serious and a fair ground for litigation.

In addition, "the balance of hardships inquiry asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided." *Tradescape.com v. Shivaram*, 77 F.Supp.2d 408, 411 (S.D.N.Y. 1999). Here, a decision against Chesapeake would cause it serious harm, while a decision for Chesapeake would cause no harm at all to the noteholders. As explained above, if Chesapeake is denied the relief it is seeking, it will be effectively precluded from sending the notice of a Special Early Redemption as a result of the risk that the notice will be deemed untimely and will instead trigger a redemption requiring payment of a $400 million make-whole payment above and beyond the principal amount of the bonds. As a result, Chesapeake will need to make hundreds of millions of dollars of future interest payments that it bargained for the right to avoid by redeeming the bonds at par during the Special Early Redemption Period.

The noteholders, by contrast, would not be harmed at all by an order clarifying that if the notice of Special Early Redemption is ultimately deemed untimely under Section 1.7(b), it

should be deemed ineffective, and not be deemed a notice of an ordinary redemption under Section 1.7(c). At most, the noteholders would be "deprived" of the possibility of a windfall from the payment of a make-whole amount that they have no right to receive and that Chesapeake has no obligation to pay – precisely the windfall that River Birch was seeking when it wrote its mischievous letter to the trustee. This windfall possibility is not a valid reason to deny Chesapeake's modest request for preliminary injunctive relief.

## CONCLUSION

For the foregoing reasons, Plaintiff Chesapeake respectfully requests that the Court enjoin Defendant BNY Mellon from treating Chesapeake's proposed Notice of Special Early Redemption at Par to be issued on March 15, 2013, as a notice of redemption requiring payment of the Make-Whole Price; issue a declaration stating that if the notice of Special Early Redemption is ultimately found to be not timely for the purpose of redeeming the 2019 Notes at par that the proposed notice shall be deemed null and void and shall not be effective to redeem the 2019 Notes; and schedule expedited proceedings in this matter.

Dated: March 8, 2013
      New York, New York

CHESAPEAKE ENERGY CORPORATION

By: _____.

Richard F. Ziegler (RZ0872)
Stephen L. Ascher (SA7820)
Marc B. Hankin (MH7001)
Anne Cortina Perry (AP8504)

JENNER & BLOCK LLP
919 Third Avenue, 37th Floor
New York, New York 10022-3908
*Counsel for Plaintiff*